#24007-a-JKK

**2006 SD 108**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

JEANNIE BARNES,                           Plaintiff and Appellant,

    v.

SPEARFISH SCHOOL DISTRICT
NO. 40-2,                                 Respondent and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

* * * *

HONORABLE TIMOTHY R. JOHNS
Judge

* * * *

DENNIS W. FINCH of
Finch, Bettmann, Maks & Hogue, PC          Attorneys for plaintiff
Rapid City, South Dakota                   and appellant.

ERIC JOHN NIES of
Hood & Nies, P.C.                          Attorneys for respondent
Spearfish, South Dakota                    and appellee.

* * * *

CONSIDERED ON BRIEFS
ON OCTOBER 2, 2006

OPINION FILED **11/29/06**

#24007

KONENKAMP, Justice

[¶1.]     The Spearfish School District decided not to renew its teaching contract with Jeannie Barnes for the 2004-05 school year based on her insubordination, violation of district policy, and poor performance.  At a hearing before the Board, Barnes argued that the district failed to comply with Board Policy 4505 and did not have sufficient evidence to support a just cause termination as required in SDCL 13-43-6.1.  After the hearing, the Board issued its decision to non-renew her contract.  Her appeal to the circuit court was affirmed.  She now appeals to this Court, and we also affirm.

## Background

[¶2.]     Jeannie Barnes was an elementary school teacher in the Spearfish School District for fourteen years.  As required by district policy, Barnes was evaluated annually by her supervising principal.  In these evaluations, the principal was required to either recommend her for continued employment or recommend that her contract not be renewed for the next school year.  For every contract term, except the 2003-04 school year, the principal supervising Barnes recommended that her employment be continued and her contract be renewed.  However, on February 24, 2004, after Principal Paul Soriano evaluated her, he recommended that the district not renew her contract for the 2004-05 school year.  According to Soriano, Barnes failed to meet the performance expectations established for her.  Specifically, Soriano recommended that just cause existed to not renew her contract based on her "continued poor performance as it related to ineffective communication with others; continued unsatisfactory response to supervision and suggestions for

-1-

improvement; continued insubordination to me, your [p]rincipal; and continued violation of Board Policy 4335, #8—'Maintain effective working relationships with colleagues.'"

[¶3.]     Barnes received a copy of this evaluation and Soriano's recommendation. Superintendent David Peters notified her in a letter dated March 15, 2004, that the Spearfish School Board had preliminarily accepted the recommendation not to renew her contract. Barnes requested a hearing before the Board. She argued that there was not enough evidence of insubordination toward her supervisors or a violation of district policies. She also alleged that the administration failed to follow the procedural requirements in Board Policy 4505. Policy 4505 mandates that the administration, before recommending that a teacher's contract not be renewed, provide the teacher with at least a minimum of two conferences. One conference must occur on or before the end of the first semester, and additional conferences may be held thereafter and into the next semester. Also, the teacher must be informed in writing of the "basis and reason for the supervision/evaluation" and receive suggested "remedial measures."

[¶4.]     After a four-day hearing, the Board ruled that the administration complied with the requirements of policy 4505. It recognized that a conference was held in September 2003, and the basis for the supervision and evaluation of Barnes and her suggested remedial measures were reduced to writing. A second conference was held in January 2004, with additional meetings between those two dates. In regard to her further claims, the Board concluded that her

> response to any attempt at supervision or suggestions for
> improvement is completely unsatisfactory when considered on

an objective basis. The aggressive, insolent, and occasionally vindictive nature of her responses support a finding that the Administration's allegation [of insubordination] is fully supported. Barnes' relationship to two different supervisors, as well as her attempted involvement of other employees in her personnel issues, support a finding that Barnes violated Spearfish Board Policy 4335, #8.

Based on this conclusion and many additional findings, the Board confirmed its preliminary decision to non-renew her contract.

[¶5.] Barnes appealed the decision to the circuit court. She asserted that the Board's findings were clearly erroneous and the Board erred when it found the administration complied with the requirements in policy 4505. The circuit court affirmed the Board's decision in its entirety. Barnes now appeals to this Court asserting that the Spearfish School District (1) had no just cause under SDCL 13-43-6.1 to non-renew her contract; (2) acted arbitrarily, capriciously, and in an abuse of discretion when it non-renewed her contract; and (3) failed to comply with the procedural requirements of Board Policy 4505.

## Standard of Review

[¶6.] Our standard of review of a school board's decision is well established:

School boards are creatures of the [L]egislature and the judiciary may not interfere with their decisions unless the decision is made contrary to law. Therefore, "[a]s long as the school board is legitimately and legally exercising its administrative powers, the courts may not interfere with nor supplant the school board's decision making process." Only the legality of the decision, not the propriety of the decision, may be reviewed by the courts. The legality of a school board's decision is determined by a two-prong review. First, the procedural regularity of the decision is reviewed. This review includes whether the school board was vested with the authority to act and whether all procedural requirements required by law were followed. Second, the school board's decision is reviewed to

> determine whether the decision was arbitrary, capricious or an abuse of discretion.

Hicks v. Gayville-Volin School District, 2003 SD 92, ¶10, 668 NW2d 69, 73 (quoting Gauer v. Kadoka School Dist. No. 35-1, 2002 SD 73, ¶5, 647 NW2d 727, 730 (additional citations omitted)) (alterations in *Gauer*).

[¶7.] A school board's decision is arbitrary or capricious when it is "founded on prejudice or preference rather than on reason or fact" or "is contrary to the evidence or established rules of law." Black's Law Dictionary (8thed 2004); *see also* Pruchniak v. School Bd. of Elk Point-Jefferson School Dist. No. 61-7, 2004 SD 133, ¶6, 691 NW2d 298, 300; Johnson v. Lennox School Dist. No. 41-4, 2002 SD 89, ¶8, 649 NW2d 617, 621. Decision makers abuse their discretion only when they make "'a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable.'" *In re* Adoption of C.D.B., 2005 SD 115, ¶11, 706 NW2d 809, 814 (quoting Arneson v. Arneson, 2003 SD 125, ¶14, 670 NW2d 904, 910).

**Analysis and Decision**

[¶8.] Barnes was a tenured teacher, having taught for more than four consecutive terms of employment, and, under SDCL 13-43-6.1, the school district may only non-renew her employment "for just cause, including breach of contract, *poor performance*, incompetency, gross immorality, unprofessional conduct, *insubordination*, neglect of duty, *or the violation of any policy or regulation* of the school district." (Emphasis added). Here, the basis of the district's decision to non-renew her contract was her "poor performance, unsatisfactory response to

supervision and suggestions for improvement, insubordination, and violation of Board Policy 4335, #8—'Maintain effective working relationship with colleagues.'"

[¶9.] Barnes contends that the Board did not have "just cause" to non-renew her contract. In particular, she claims the definition of insubordination used by the Board is incomplete. The Board defined insubordination as "not submitting to authority; disobedient." Barnes would use the definition of insubordination from the Sixth Edition of Black's Law Dictionary: "refusal to obey some order which a superior officer is entitled to give and have obeyed. The term imports a willful and intentional disregard of the lawful and reasonable instructions of the employer." With this definition, she asserts that there is no evidence of her "willfully or intentionally disregarding any instructions of her supervisors."

[¶10.] The definition Barnes asks this Court to adopt is obsolete. She cites the Sixth Edition of Black's Law Dictionary, which has been twice updated and now exists in its Eighth Edition. Black's Law Dictionary now defines insubordination as: "(1) A willful disregard of an employer's instructions, esp. behavior that gives the employer cause to terminate a worker's employment. (2) An act of disobedience to proper authority; esp., a refusal to obey an order that a superior officer is authorized to give." (8thed 2004). The definition of insubordination used by the Board and accepted by the circuit court was adopted by this Court in *Schroeder v. Department of Social Services*, 1996 SD 34, ¶10, 545 NW2d 223, 228, and restated in *Bad Wound v. Lakota Cmmty Homes, Inc.*, 1998 SD 25, ¶18, 576 NW2d 229, 232. This definition is sufficient. Moreover, it is in accord with the second definition of insubordination as stated in Black's Law Dictionary (8thed 2004).

[¶11.] Nonetheless, Barnes asserts that the Board's finding that she was insubordinate is clearly erroneous. She further argues that the Board's decision was arbitrary, capricious and an abuse of discretion. According to Barnes, there is no evidence that she refused to obey any orders from her supervisors. Rather, she contends that "[i]t is clear that what occurred here could probably best be described as personality conflict between Barnes and Fridell and which carried over into Soriano's administration." Further, she alleges that "[t]he conflict was precipitated to some extent by [her] fear of Fridell wanting to 'get rid of her' and prompted her to respond to many issues by written memos that were either authorized by or at least suggested by [her] union representative." These memos, according to Barnes, never "rose to the level of insubordination as defined by law."

[¶12.] During the four-day hearing, the Board heard testimony from Barnes; Principals Paul Soriano and Hank Fridell; Dave Peters, the Spearfish School District superintendent; Michael Brubaker, the South Dakota Education Association representative for Barnes; Dave Jewett, the director of special services for the district; Dr. Jim Hess, an expert in psychology; Karen Kisaack-Wilson, a special education teacher who worked with Barnes; Kathryn Witt, a core teacher who also worked with Barnes; Deb Balding, an aide in the classroom with Barnes; and several parents of her students. The Board also received over seventy documents into evidence regarding her evaluations, classroom performance, and alleged communication deficiencies. In its findings and conclusions, the Board identified and addressed each exhibit pertaining to her performance. Because the

#24007

Board's decision centers particularly on its review of the evidence, the exhibits in the record are examined here in detail.

[¶13.]    One of the first exhibits was the 1998 performance evaluation for Barnes. Her principal at that time was Hank Fridell. When he evaluated her, he checked "Meets Standards" for each of the areas assessed and then recommended her for continued employment. However, in the comments section, he noted that he had previous concerns about her communication problems with staff, but declared that at this juncture, he "was not aware of any problems in this area." He also wrote that she was "selective in what she chooses to participate in with staff development opportunities," which "prevents her from making a larger impact outside her classroom." Ultimately, however, he concluded that she is "an excellent teacher."

[¶14.]    When Fridell presented Barnes with his evaluation, she refused to sign it. Even though he told her that it was "a positive and accurate reflection of her work," she disagreed with his comments about her communication problems and selective participation. She submitted a written response specifically challenging the basis for each comment, except his observation that she was an excellent teacher.[1] The letter was included in her personnel file and three days later she

---

1.    In her letter, she wrote that "some of the information in the evaluation does not belong there." According to Barnes, she did not know how to interpret a comment Fridell made about her classroom "being a marked improvement from last year." If it was a problem before, she believed "the school district had ownership of that problem." In response to her alleged communication problem, she stated, "I thought these issues were cleared up, and I don't appreciate having to deal with them again in my evaluation, especially since it involved people reacting to hearsay." As to her "selective participation,"

(continued . . .)

signed the evaluation. The Board examined these documents and found that Fridell's evaluation was "positive," the letter response from Barnes was "confrontational in tone, [sought] to establish an adversarial relationship, and exhibit[ed] a refusal to submit to supervision," but Fridell's response was "moderate in tone and attempt[ed] to open lines of communications. . . ."

[¶15.] In 2000, Fridell drafted a memo to be included in her personnel file. It documented the circumstances surrounding an incident where he requested that she remove a couch from her classroom. The couch was considered a fire hazard. Yet Barnes believed she should be able to keep it in her classroom. After the custodians removed the couch from her room, she directed them to return it. Thereafter, she talked to Fridell, who told her again that the couch needed to be removed. She next talked to the superintendent, Dave Peters, who informed Fridell of the conversation. Fridell again denied a request from Barnes to keep the couch, and, in a memo, directed her to remove it, and if she did not, he would dispose of it. Also, if she involved any employee in her attempt to keep the couch, Fridell told her that he would consider it insubordination. The conclusion of the memo requested that Barnes provide her signature. She refused. She was given a copy of the memo on August 30, 2000, and Fridell documented the meeting in another memo, noting her refusal to give her signature.

_____

(. . . continued)

Barnes explained that because participation is voluntary, "this is outside the bounds of a school evaluation." Finally, she remarked, "If Mr. Fridell has concerns regarding my performance, I would appreciate specific measurable criteria by which my future performances will be adjudicated."

[¶16.]     Barnes submitted a written response to Fridell's memo, defending her actions in keeping the couch and disagreeing with Fridell's opinion that she acted improperly or against his decision to have it removed. She further accused Fridell of being "unfair, unprofessional, and not keeping with the goals of the school district."[2] The Board examined these documents and found that "Barnes countermanded reasonable orders," exhibiting "a refusal to submit to supervision." Also, her written response, according to the Board, was "insolent in tone and represent[ed] a distorted view of the rights an employee has on non-public issues relating to conduct of class and performance of duties."

[¶17.]     Barnes was again evaluated by Fridell in 2001. Unlike his 1998 evaluation, however, he did not check "Meets Standards" for all criteria. Instead, he checked "Needs Improvement" under "Communicates clearly and effectively," "Responds to supervision and suggestions for improvement," and "Commitments to professional growth." In his comments, Fridell set forth specific examples to support his concerns and also listed what expectations he had for Barnes to improve in these areas. Ultimately, he recommended Barnes for continued employment.

---

2.     Barnes wrote in her letter,

> It was my opinion, and I believe I am entitled to have my own opinion. Are opinions valid only when they are agreeable to leadership? . . . I think my opinion is compatible with the federal laws already in place. . . . In my classroom I have to be open to different opinions and encourage questioning. I hope that administrators are held to the same standards. Please, don't forget that the right to an opinion is a first amendment right. . . . In a healthy environment, freedom of opinions and discussion is not suppressed, but encouraged because it creates a re-examination of everything that is held to be true and promotes growth.

When he provided her with a copy of the evaluation, she refused to sign it, informing him that she would respond in writing.

[¶18.] In a letter, Barnes responded to each of Fridell's examples and comments. She disputed his belief that she needed improvement in the area of communication, or that she failed to respond to supervision or suggestions for improvement. Rather, she asserted that Fridell had failed to give her "specific measurable objectives by which [her] future teaching performance [would] be adjudicated." She also stated that she has "tried to settle things informally as witness[ed] by [her] detailed responses." Barnes concluded her letter by stating, "I am looking forward to a long career in the Spearfish School System, in an environment that will become free from time consuming, frivolous and unethical intimidations." She attached to her letter the code of ethics for professional administrators. The Board found that her letter was "defensive and insolent in tone," and "contain[ed] accusations of unethical and unprofessional activities on the part of her supervisors without presenting the basis for her charges." Further, it concluded that she has a "distorted perception of the supervisory relationship between an employer's representative and an employee." Fridell's evaluation, according to the Board, supported his "conclusions regarding Barnes' need for improvement in certain areas."

[¶19.] In April 2001, Fridell received a complaint from a student's parent. The parent was concerned about a video Barnes showed in her classroom, entitled, "Native Lands." Fridell learned that Barnes showed the video to her third grade class without personally viewing it beforehand. Although the video was part of the

school's library collection, Fridell believed that it had "vocabulary, concepts and references to people and places" that were "well beyond third graders being able to handle without a good deal of support." Fridell concluded that Barnes, not having reviewed the video first, "was unable to assist her students in understanding the complex material, she was unable to judge the appropriateness of the material, and she was not fulfilling her responsibilities as a teacher."[3]

[¶20.]	In a meeting with Barnes, Fridell expressed his concerns. Barnes would not concede that showing the video was a mistake. As a result, Fridell drafted a letter of reprimand, outlining his concerns and specifically setting forth a plan of action. In particular, Barnes would be required to give Fridell a copy of a weekly written plan for instruction for the remainder of the school year. Fridell met with Barnes to discuss the letter of reprimand and his plan of action. After he began receiving lesson plans, the two began e-mailing each other to address each other's questions.

[¶21.]	Barnes responded in writing to the entire situation, including Fridell's letter of reprimand. In a single-spaced, four and one-half page letter, Barnes justified her decision to show "Native Lands" to her class, stating that she "thought the video did a good job of explaining what civilization was and why they were

---

3.	Specifically in regard to the video's depiction of the formation of different civilizations, Fridell stated,

> The video's depiction of cultures, myths and rituals was interesting, in that the native cultures were shown in an artistic, dramatic dance format, using masks and interesting landscapes. The depiction of Adam and Eve, however, was done in a "Keystone Cops," silent movie style using a ridiculous set. As a result I found the approach to compare "western" and "native" cultures had a built in bias.

formed." After explaining why showing the video did not deserve a reprimand, Barnes stated, "[i]n the four years that Mr. Fridell has been my principal, this is just one of many overblown and deceptive judgments on my tenure that Mr. Fridell has used in his quest to get me fired or discouraged enough through reprisals to quit." The Board found that the tone of this letter was "insolent and confrontational." Also, the series of e-mails about her lesson plans, according to the Board, were "indicative of Barnes' argumentative attitude and totally unnecessary attempted refutation of every suggestion or comment." It further concluded that Barnes "believes that being called to task for her mistakes is an injustice" and her statements were evidence of her general refusal to submit to authority and of her belief "that she has some voice in policy-making within the District."

[¶22.]    At the end of the year, Fridell evaluated her progress in the three areas needing improvement from the previous evaluation. He determined that she had failed to make sufficient progress and identified particular examples to support his conclusions. He explained that her "approach to [his] supervision [was] confrontational," her "communication skills [were] ineffective in bringing about needed improvement," and her "commitment to growth [was] limited because [she] has difficulty reflecting on mistakes [she has] made." In this evaluation, Fridell informed Barnes that he would be transferring to another building and would no longer be her supervisor. However, he told her that he would suggest to the new principal, Soriano, "that at the beginning of the school year, the two of you identify a plan to address the areas needing improvement and that an evaluation be completed next year to document progress in those areas."

[¶23.] Barnes responded to this evaluation with another letter. She declared that she has "every right" to respond to her evaluations, there was "nothing confrontational about making a request," she "complied with the punishment of doing detailed lesson plans," and, in her opinion, "Mr. Fridell's approach to supervision has been to insult, intimidate, manufacture problems, and threaten to fire me for four years." She asserted that she has "responded within [her] rights, stayed cordial in dealing with Mr. Fridell, documented with evidence, [and] appealed for help. . . ." In recognition that Fridell would no longer be her supervisor, Barnes "desired assurances in writing from Mr. Peters [the superintendent], that Mr. Fridell will not be able to dictate that [she] be put on any kind of plan for areas needing improvement at the beginning of the next school year," because "Mr. Soriano should judge for himself." The Board found this letter to be accusatory and attacking.

[¶24.] The following school year, 2001-02, Paul Soriano became her supervisor. He, like Fridell, documented his meetings with Barnes. After one particular meeting in October 2001, Soriano wrote a memo to Barnes clarifying his responses to certain questions Barnes asked about teaching Spanish to her students, extra recesses, and writing topics. After answering her questions, he remarked, "two areas have been identified in which you, as an employee, must improve (1) communicating clearly and effectively and (2) responding to supervision and suggestions for improvement." He informed her that he would continue to visit with her "throughout this semester and next semester to discuss and evaluate [her] performance" in the areas identified.

[¶25.] On March 27, 2002, Soriano evaluated Barnes, assessing her progress since their October meeting. He noted that since their meeting she had improved in the area of "Responds to supervision and suggestions for improvement." However, he believed that she still needed to work on "Communicates clearly" because of his concerns about her communication skills with him, the parents, and the students. As support for his conclusions, Soriano attached a document containing specific examples.[4] He then set forth five recommendations to Barnes for her to improve her communication skills.[5] Barnes and Soriano signed the evaluation on April 3, 2002.

---

4.     His examples were:

   1. Letter of concern from Dr. and Mrs. M. regarding their daughter, M.M. (10-22-01).
   2. J.E. math situation (12-6-01).
   3. Request for Professional Leave submitted 1-21-02.
   4. Recess action in which a student was not allowed to come into the building, thus, "wetting" himself. (1-30-02).
   5. Restroom problem with boys and resulting e-mail response (3-7-02).
   6. Letter of concern from Mr. & Mrs. O. regarding their daughter, J.O. (3-24-02).
   7. Confusion by Barnes with post-observation conference. E-mail sent 3-27-02.

5.     The following recommendations were included:

   1. Explain classroom procedures, expectations, etc. clearly to students and parents to minimize confusion.
   2. Inform Principal of all parent meetings that may be of controversial nature, so that he may attend if necessary.
   3. Communicate professionally when submitting written communication to the Principal.
   4. If in doubt about school procedures, rules, practices, etc.; please visit with the Principal for assistance.
   5. If unsure about communication from the Principal, please visit with him for clarification in a timely manner.

[¶26.] Three days later, Barnes submitted a written response to the evaluation. She disputed Soriano's examples and justified her actions, asserting that he did not have support for his concerns. She argued that he was attempting to "build a case against" her by fabricating and stretching situations. She also wrote, "the lack of support I have received on these concerns has been potentially disrespectful and unprofessional. Even a criminal is innocent until proven guilty. I feel Mr. Soriano's communication with me has been, at times, condescending and threatening. There is the communication problem."[6] The Board regarded her response as "combative in tone, contain[ing] direct personal attacks on her supervisor, and documents an unwillingness to submit to supervision."

[¶27.] On May 3, 2002, Barnes, one of her student's parents, and Soriano met to discuss the parents' concerns about their son. After the meeting, Soriano wrote a memorandum to Barnes summarizing the substance of the meeting and identifying areas he believed Barnes still needed to improve related to her communication deficiency. He wrote, "Your responses, in my opinion, did not effectively and

---

6. Barnes spent another page explaining how she believed Soriano was communicating poorly with her. She stated,

> I want this potentially disrespectful and harassing behavior towards me to stop. I would like to get a response back from Mr. Peters [the superintendent]. I feel that I have exhausted all appeals to settle things informally. I don't think it is in the best interests of my students, myself, East Elementary, Spearfish School District or the community to show a blind eye to what is going on. Mr. Soriano told me at the March 28th meeting if I responded to my evaluation in writing it would show I had communication problems. I disagree. This methodology offers me an opportunity to directly express my feelings and not be misunderstood. I believe it is a right afforded to me in the negotiated agreement. Would the administration deny me this right?

positively address the heart of [the parents'] concerns." According to Soriano, the parents wanted to discuss their son's relationship with Barnes, but Barnes responded by discussing the student's reading level information and academic performance. Also, when Soriano and Barnes initially discussed the parents' letter of concern, he reiterated that she responded by stating, "they have a problem." Accordingly, he explained that "[i]t is important that [she] accept responsibility in this relationship as well." He then identified four areas for her "to become more positive and effective in improving [her] communication."[7] Barnes replied in writing, asserting that she is professional in her communications and that Soriano should present "specific identifiable criteria by which [she] will be judged."

[¶28.]        On May 27, 2002, Soriano held an end-of-the-year meeting with Barnes to discuss her progress in relation to her need to improve her communication skills. In his memorandum summarizing the meeting, Soriano stated that she still needs to improve her "communication skills with parents, staff, students," and him. As a result, he included a bulleted list of recommendations,

---

7.    The specific areas Soriano suggested:

(1) "Accept responsibility in the processes of communicating and building relationships with others."

(2) "Work to understand what others are trying to communicate to you. Sometimes people have difficulty communicating their true feelings to others, we must encourage open and honest communication. If we don't, we are forced to 'read between the lines.'"

(3) "Work to understand how your communication is being perceived by others. What do your words, tone of voice, body language, eye contact, etc. communicate? Is your communication perceived as being sincere, empathic, and caring?"

(4) "Work towards the goal of a 'win-win' resolution to a problem. It takes practice and focus to achieve this goal, but positive relationships are built as a result."

which were previously set forth in the March 27 evaluation and combined with the May 13 memorandum. He also indicated that they would meet again in August to "discuss [her] written plan on how [she] will specifically address [his] recommendations above." Barnes responded by challenging his recommendations. She restated each recommendation and then questioned what "criteria" would be used for assessing her in that area. This response, according to the Board, was "insolent in tone, and question[ed] the authority of Soriano as her supervisor."

[¶29.] As planned, Soriano met with Barnes in August 2002 to discuss her written plan. As indicated in the plan, its purpose was "to outline procedures and seek available resources to assist [her] in addressing" the areas needing improvement. He also informed her that it was his "role as her principal" to "coordinate the effort of the resources and monitor progress." Soriano would also monitor and review the implementation of the plan weekly until February 15, 2003, and "[o]n or before March 1, 2003, the degree to which [she has] successfully addressed" the areas will be reviewed with her. Barnes, in a letter, challenged the basis for Soriano's expectations and demanded criteria by which she would be assessed. In response, Soriano drafted another written plan, clarifying his expectations, including more specific expectations and descriptions.

[¶30.] In September, Soriano became concerned with her behavior in talking to other teachers about personnel issues. He met with her to discuss his concerns, and, on September 9, 2002, he prepared a memorandum summarizing the meeting. According to his memo, he indicated to Barnes that sharing information with other staff members about personnel issues "contradicts [her] plan to improve in the area

of communicating effectively." He informed her that it was "inappropriate, undermine[d] school authority, ha[d] a negative impact on staff morale, and must stop." Barnes responded in writing, asserting that Soriano made false accusations against her. She declared that "[m]aking such malicious and inaccurate accusations without the slightest degree of investigation is unprofessional and unethical. . . . I believe Mr. Soriano undermines his own authority and imposes a low morale on the teachers by his own inappropriate actions. . . ."[8] She also challenged "the validity

---

8. Her letter continues,

These actions on Mr. Soriano's part indicate no compliance of working on a win-win situation. These constant meetings going over my communications with a fine-tooth comb proves that this is a very sad, personal, and vindictive situation that helps no one. The blatantly untruthful allegations show the degree to which administration, let alone educational, ethics have fallen. I realize all my responses and requests for help with this situation have fallen on deaf ears. . . .

There is a pattern here that began with Mr. Fridell and has continued with Mr. Fridell's surrogate, Mr. Soriano, with Mr. Fridell's continued active input. Perhaps another forum could objectively analyze this pattern that has unfairly separated me from equitable standards or even those standards used to judge my colleagues. Again, I make an appeal for aid so that I might serve my students without outside intimidation. If I do not find it here, I will seek it elsewhere to the fullest extent that my rights allow.

As to the current "plan," I believe evaluating people on potential hearsay is not part of our district policy. To knowingly distort the evaluation of an educator is unprofessional and unethical. . . .

I believe this current plan of Mr. Soriano's is unjust and inequitable. It is a sham. It was imposed by Mr. Soriano and administered by Mr. Soriano. He is judge, jury, and shoot-from-the-hip prosecutor. He means not to help me; he means to convict me. The plan is vague and arbitrary because his standards are continually interpreted, reinterpreted, and misinterpreted by Mr. Soriano, who is determined to see me fail. I have continually asked for the constant measurable standards by which I will be judged and have yet to receive them.

of the weekly meetings," arguing that they were "meant to harass [her] and interfere with [her] work."

[¶31.]     In response to this letter from Barnes, Soriano and Superintendent Peters together issued her a letter of reprimand.  It set out her performance deficiencies, which had been previously identified as far back as May 2001.  It also noted that she has "intentionally and willfully failed to heed the warning or follow" any of these performance expectations.  In regard to her most recent written response, the letter of reprimand indicated that her "accusations and threats [were] highly inappropriate and unprofessional, and extremely serious."  Her conduct, Soriano and Peters stated, "not only violate[d] performance expectations but also fail[ed] to recognize commonly accepted employer-employee communication standards and respect for supervision and authority."  They informed her that her written response violated "School District Policy 4335, Section 8, to maintain effective working relationships with colleagues, and Section 9, to follow the ethics of the profession[.]"  The letter of reprimand directed her to cease her insubordination immediately.  It then identified three directives, which would be added to her written plan as performance expectations.[9]  They warned her that her failure to follow the directives could result in termination of her employment.

---

9.     The three directives were:

> **Employer-Employee Communications.**
> . . .
> You are hereby issued this <u>final</u> reprimand and performance expectation with respect to employer-employee communications:  any further communication from you to your Principal or any other administrator, or concerning these persons, containing language that your Principal reasonably considers in his professional judgment to be

(continued . . .)

[¶32.]    Barnes responded in writing, thanking Soriano and Peters for meeting with her and requesting clarification on certain points.  As before, she questioned what the criteria would be by which she would be assessed.  She also denied that her communications "contained any information or statements which were intended to be 'accusations and threats' which are highly inappropriate and unprofessional, and extremely serious."  Rather, she asserted that "these communications were

_____

(. . . continued)

> inappropriate or unprofessional within the employer-employee relationship will be cause for your Principal to recommend your discipline up to and including termination of your employment.  Your Principal set forth specific performance expectations in this area almost a year ago in the attached memorandum, and you are required to review them and abide by them.  No further incidents such as the September 10, 2002 memorandum will be tolerated.

> **Communication with others.**
> . . .
> With regard to your failure to follow the clear performance expectation that you not discuss your confidential personnel matters with other school staff members, you are hereby issued this <u>final</u> reprimand and performance expectation:  Any further reports to your Principal by any teacher or other staff member that you are discussing your confidential personal matter with them which he first discussed with you and asked you to keep private, with the expectation of the authorized SEA representative, will be cause for investigation by administration and maybe cause for your Principal to recommend your discipline up to and including termination of your employment[.]
> . . .
> **Weekly meetings.**

> It is inappropriate for you as an employee to question whether or not your Principal will hold a meeting with you, or how often such meetings occur, or whether such meetings are accomplishing a particular goal established by your Principal.  You did this very thing in your September 10, 2002 memorandum.  Your supervisors, past and present, have identified and documented performance deficiencies in the areas of communication for which performance expectations have been established.  Your Principal will determine whether and when a performance expectation has been attained and to what degree.

intended to seek additional information and to clarify what was being stated by the district administration." Moreover, she argued that she had not "participated in activities that have been insubordinate to the Spearfish School District." She concluded by asking that she be given "specific measurable criteria by which [her] performance will be adjudicated." This particular response, according to the Board, was "clear evidence of Barnes' inability and unwillingness to take responsibility for her own prior communications."

[¶33.] When Barnes was evaluated the following March 2003, Soriano told her that she had improved in her communication with students and parents. However, he still had concern because she continued to exhibit a deficiency in her communication with fellow staff members and administration. Therefore, in the evaluation, Soriano restated the performance expectations that had been previously established for her and also indicated her progress in relation to each expectation. Barnes responded to this evaluation, in writing, explaining why his conclusions were unwarranted.

[¶34.] In April, Soriano wrote a letter to Barnes because he was concerned about her conduct in relation to the Business Fair. In this letter, he identified three issues: (1) although informed of the proper procedures, she did not follow them as directed; (2) instead of asking questions of her teaching team, she asked Soriano, which to him exhibited her failure to accept responsibility in the communication process and building relationships with others; and (3) when she filed a concern about the Business Fair with the superintendent, this, according to Soriano, had a negative impact on her teaching team's morale. In response, she wrote a letter

arguing that there were no problems with her communications in relation to the Business Fair. According to Barnes, the "perceived problems [she has] according to Soriano, are just that. If a specific person has a problem with [her], then that person should be asked to come visit with [her]. [She] should not have to go on a hunting expedition for a perceived problem with an unidentified source." In relation to the most recent letters submitted by Barnes, the Board found that she continued to respond by "denying any possibility of improper behavior, attempting to justify her actions and attacking her supervisor."

[¶35.] At the end of the 2002-03 school year, Barnes received another formal evaluation from Soriano. In this evaluation, he informed her that he still saw a need for her to improve her communication skills. He summarized her performance expectations in certain "communication areas," which were the same as those provided to her starting in October 2001, added to in March, May, July, and September 2002, and included in the directives from her October 2002 letter of reprimand. In each area, he noted whether she was "Improving," "Needs Improvement," or "No Information." He ended the evaluation by recommending her for continued employment and stating that they would continue to meet regularly beginning in the next school year.

[¶36.] At the beginning of the next school year, September 2003, Soriano met with Barnes to discuss what he expected from her on improving her communication skills. He provided her with a memorandum identifying the previously established performance expectations. He also informed her that they would continue to meet during the 2003-04 school year to discuss her progress. She acknowledged this

memorandum by signing it on September 22, 2003. Soriano and Barnes met again on January 27, 2004, regarding the "Monthly Meeting and Continued Concerns." Soriano, in his memorandum summarizing the meeting, set forth the same performance expectations identified previously, and then stated his concerns in regard to some of the expectations. He did not go into detail, but instead, included a simple notation under the subject matter that concerned him. In response to this memorandum, Barnes wrote a letter justifying her behavior in relation to each concern.

[¶37.] On February 24, 2004, Soriano formally evaluated Barnes. In this evaluation, Soriano concluded that she should not be recommended for continued employment. A witness signed the evaluation confirming that Barnes received a copy on February 24, 2004. The copy of the evaluation with her signature bears the date, March 2, 2004. In deciding that she should not continue her employment, Soriano remarked that Barnes had not met the performance expectations that were "established to help [her] improve [her] communication skills [that] have been documented for [her] through monthly meetings" with him "over the past three years, which include continued performance deficiencies." Specifically, he did not recommend her because of her "continued poor performance as it related to ineffective communication with others; continued unsatisfactory response to supervision and suggestions for improvement; continued insubordination [to her principal]; and continued violation of Board Policy 4335, #8—'Maintain effective working relationships with colleagues.'" Soriano identified for Barnes particular instances of poor performance in regard to each performance expectation.

[¶38.]      In answer to the Board's findings on her various written responses, Barnes now contends that she merely "asked a lot of questions" and drafted "very detailed" memos to her supervisors. She insists that her conduct "was within her right to defend herself and raise questions" and did not rise to the level of insubordination. The Board, through ninety-six findings of fact, examined the parties' exhibits and evaluated the substance and credibility of the testimony offered. It concluded that "Barnes' confrontational approach to supervisors invited escalation in response and evidenced a pattern of refusal to submit to authority, and is, thus, insubordinate." Also, her "unsupported belief that she is in control of her curriculum and classroom methods constitutes disobedience, and is, thus, insubordinate." The Board did, however, reject the administration's "assertion that Barnes exhibits 'poor performance' in teaching" as a basis for her non-renewal. Nonetheless, it held that "when considered in conjunction with her attempts to undermine her supervisor's authority and foment disruption among staff members regarding personnel issues, her total performance as an employee in the [d]istrict falls short of board expectations."

[¶39.]      Based on our review of the evidence we cannot say that the Board's findings are clearly erroneous. Furthermore, the Board properly applied this Court's definition of insubordination, and the evidence clearly supports the Board's conclusion that Barnes did not submit to authority and was disobedient. Accordingly, the Board's detailed decision setting forth the basis for non-renewing her contract was not arbitrary, capricious, or an abuse of discretion.

[¶40.]      Barnes presents one last issue on appeal:  did the district fail to comply with Board Policy 4505?  Policy 4505 states in part:

> Before a teacher or administrator is given the evaluation, "not recommended for employment," the supervisor conducting the supervision evaluation will have a minimum of two conferences with the teacher or administrator relative to the areas of weakness.  The first of these conferences shall be held on or before the end of the first semester.  Additional conferences may be held during the second semester if the situation merits additional conferences.  The basis and reason for the supervision/evaluation will be discussed and remedial measures suggested to the teacher or administrator in writing.

She argues that the only "conference resulting in a written suggestion of 'remedial measures' as required by policy 4505 is shown in a January 27, 2004 memo to [her] from Soriano."  The district, however, contends that Barnes received her first conference in September 2003, evidenced by the memorandum summarizing their meeting and detailing "13 specific performance expectations and suggestions for improvement."

[¶41.]      "[S]chool board policies have the force of law and must be complied with."  *Hicks,* 2003 SD 92, ¶30, 668 NW2d at 77 (citing Iversen v. Wall Bd. of Educ. (*Iversen II*), 524 NW2d 624, 628 (SD 1994); Schnabel v. Alcester School District No. 61-1, 295 NW2d 340, 341 (SD 1980)).  Because Barnes concedes that she received one conference in January 2004, where remedial measures were provided, we need only decide if she was provided with a conference, "on or before the end of the first semester" and whether as a result of that conference remedial measures were provided in writing.  Policy 4505 does not define what constitutes a "conference."  However, in light of the context in which "conference" is used throughout the text of the policy, we conclude that a conference is akin to a meeting.  Therefore, we

examine the record for evidence that Soriano met with Barnes "on or before the end of the first semester" and whether the "basis and reason for the supervision/evaluation [was] discussed and remedial measures [were] suggested to [her] in writing."

[¶42.] At the hearing before the Board, Soriano testified that in September 2003, he met with Barnes and discussed with her his expectations related to her continued need to improve her communication skills. He then summarized their meeting in his September 22, 2003 memorandum. In this memorandum, Soriano refers to his May 28, 2003 memorandum, where he indicated that he and Barnes were to meet at the beginning of the 2003-04 school year. His memorandum also includes a list of performance expectations, which, according to Soriano, were to assist Barnes in improving her communication skills with others.

[¶43.] Soriano's September meeting with Barnes, in which they discussed her continued need to improve her communication skills, established the basis and reason for her evaluation and constitutes a conference that occurred "on or before the end of the first semester" as required by policy 4505. Moreover, although Soriano did not use the term "remedial measures" in his memorandum, the suggestions listed by him satisfy the requirements of policy 4504. The thirteen suggestions, if followed by Barnes, clearly would have assisted her in remedying her communication deficiency.[10] Moreover, the same suggestions were restated in the

---

10. The memorandum states,

    A. Visit with your Principal in person, not through memos and e-mails when you need clarification, discussion, guidance, etc.
    B. Be positive and professional in your communications with others.

(continued . . .)

#24007

January 27 memorandum, which Barnes concedes amounted to remedial measures.

She was aware of what Soriano meant with each performance expectation, as the

September 22 and January 27 expectations were identical to those Soriano provided

_____

(. . . continued)

    C. Adhere to board Policy 4335 #8 – "Maintain effective working relationships with colleagues."

    D. Acquire and internalize resources that deal with building and maintaining effective employer-employee relationships.

    E. Explain classroom procedures, expectations, etc. clearly to students and parents to minimize confusion.

    F. Inform Principal of all parent meetings that may be of a controversial nature, so that he may attend if necessary.

    G. Communicate professionally when submitting written communications to the Principal.

        ▪ 2003-04 Signature Page dated 9/5/03.

    H. If in doubt about school procedures, rules, practices, etc., please visit with the Principal for assistance.

    I. If unsure about communication from Principal, please visit with him for clarification in a timely manner.

    J. Accept responsibility in the processes of communication and building relationships with others.

    K. Work to understand what others are trying to communicate to you; work to understand how your communication is being perceived by others; work towards the goal of a 'win-win' resolution to a problem or issue.

    L. Employer-Employee Communications: "Any further communication from you to your Principal or any other administrator, or concerning these persons, containing language that your Principal reasonably considers in his professional judgment to be inappropriate or unprofessional within the employer-employee relationship will be cause for your Principal to recommend your discipline up to and including termination of your employment."

    M. Communication with Others: "Any further reports to your Principal by any teacher or other staff member that you are discussing your confidential personal matters with them which he first discussed with you and asked you to keep private, with the expectation of the authorized SEA representative, will be cause for investigation by administration and maybe cause for your Principal to recommend your discipline up to and including termination of your employment[.]

to her during the previous two years.  Therefore, the Board did not err when it held that policy 4505 was followed.

[¶44.] Affirmed.

[¶45.] GILBERTSON, Chief Justice, and SABERS, ZINTER, and MEIERHENRY, Justices, concur.